# AFFIDAVIT OF CHARLES E. SIMON

I, Charles E. Simon, being duly sworn, depose and state as follows:

1.     I have been employed as a Special Agent with the Federal Bureau of Investigation ("FBI") since 2011. For the majority of that time, I have been engaged in gang and drug investigations. I am currently assigned to the Boston Field Office, North Shore Gang Task Force. I am a "federal law enforcement officer" as defined in Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure, that is, a government agent who is engaged in enforcing the criminal laws of the United States and within a category of officers authorized by the Attorney General to request a search warrant.[1]

2.     Prior to my employment with the FBI, I was employed by the Wichita Police Department in Wichita, Kansas from May 1999 through February 2011. As a Police Officer in Wichita, I held the positions of Patrol Officer, Drug Officer, Gang Intelligence Officer, Night Detective, and Felony Assault/Gang Detective. In the course of all these positions, I have participated in numerous

---

1 Previously, I was assigned to the New Orleans Field Office, Shreveport Resident Agency and to the Northwest Louisiana Violent Crimes Task Force from July 2011 until November 2015. I then transferred to the Boston Division and was assigned to the Organized Crime Squad until June 2016.

investigations of narcotics, firearm and violent felony crimes. I have conducted investigations utilizing complex investigative techniques and the utilization of analytical methods during homicides, shootings, aggravated assaults, aggravated batteries, narcotic, firearm, fraud, and theft investigations.

3. I have received training and experience in interviewing and interrogation, arrest procedures, search and seizure, criminal organizations, narcotics, money laundering, search warrant applications, and various other investigative techniques and methods. During the course of my employment with the FBI and the Wichita Police Department, I have served as a Case Agent and/or assisted other agents/law enforcement officers in investigations which involved the use of undercover officers, confidential sources, cooperating witnesses, physical surveillance, pen registers, trap and trace devices, toll analysis, CCTV surveillance, consensual recordings and monitoring, drug and firearm evidence purchases, service of arrest warrants, subject interviews, conducting short-term and long-term narcotics and gang investigations, conducting court-authorized electronic surveillance, conducting court-authorized Title III wiretap investigations, preparing and executing search warrants that have led to substantial seizures of narcotics, firearms, and other contraband.

4.  I have participated in the investigation described in detail below.  During my work on this investigation, I have interviewed witnesses about their knowledge of the matters described below, and reviewed recordings of meetings.  I have reviewed reports prepared by other agents and Task Force Officers and also conducted surveillance and discussed this case with other law enforcement officers who have assisted in this investigation.  As a result of my personal participation in this investigation, through my conversations with other law enforcement officers and my analysis of reports prepared by other officers, I am familiar with this investigation.

## INTRODUCTION

5.  I am submitting this affidavit in support of an application for the issuance of search warrants authorizing the search of 92 Haverhill, First Floor Front Apartment, Lawrence, Massachusetts ("the Target Premises") and a 2007 Infiniti G35 sedan, white in color, bearing MA registration 3RZ815, VIN JNKBV61F77M815751, and registered to **NORMA CLAUDIO** ("the Target Vehicle,") more fully described below in the section entitled "Description of the Premises to be Search".  As described more fully hereinafter, there is probable cause to believe that **NORMA CLAUDIO ("CLAUDIO")** and **JUAN RAMON FERNANDEZ** a/k/a "RAMON"

("**FERNANDEZ**") live at and/or exercise dominion of the Target Premises, and at least as recently as July 29, 2019, have stored at and/or distributed crack cocaine, a Schedule II controlled substance, from in or around the Target Premises and used the Target Vehicle to do so, in violation of federal law, including 21 U.S.C. §§841(a)(1) and §846. For the reasons set forth herein, I believe that there is probable cause to believe that evidence of the above-referenced Title 21 offenses, including, but not limited to, crack cocaine, drug packaging materials and other paraphernalia, amounts of U.S. currency obtained as a result of illegal crack cocaine sales, and documents relating to controlled substances distribution, more fully described below in the section entitled "Items to be Seized," will be contained within the Target Premises and Target Vehicle.

6. This affidavit is being submitted for the limited purpose of establishing probable cause to believe that evidence of the above-described Title 21 offenses described below in the section entitled "Items to be Seized" will be located in the Target Premises and the Target Vehicle. Accordingly, I have not included each and every fact known to myself and other law enforcement officers involved in this investigation.

## DESCRIPTION OF THE PREMISES TO BE SEARCHED

7.     The Target Premises is described as follow:

The Target Premise encompasses 92 Haverhill
Street, first floor front apartment,
Lawrence, MA.  92 Haverhill Street is a
multifamily two-story red brick home. There
are 2 entry doors to the first floor front
apartment, one at the front of the building
and the other at the right side of the
building. 92 is marked on the right front
pillar of the building by the front door in
black numbers. The front door to the First
Floor Front Apartment is immediately to the
right upon entering the front door of the
building.  That door is white and has a
double locking system. Photos of the Target
Premises are included in Exhibit A attached
to this Affidavit.

The Target Vehicle is described as follows:

The Target Vehicle is a 2007 Infiniti G35
sedan, white in color, bearing MA
registration 3RZ815, VIN JNKBV61F77M815751,
and registered to **NORMA CLAUDIO.**

## FACTS ESTABLISHING PROBABLE CAUSE

8.     Beginning in approximately June, 2017, the North Shore

Gang Task Force ("NSGTF") consisting of the FBI, Homeland

Security Investigations ("HSI"), and the Massachusetts State

Police ("MSP") initiated operations focusing on narcotics

distribution in the Lawrence, MA area.  In this investigation, a

cooperating witness ("CW-1")[2] was used to make controlled

---

2 CW-1 began working with the FBI after being arrested on drug

purchases of cocaine base and other drugs from dealers operating in the city of Lawrence.  CW-1 conducted three (3) controlled purchases of crack cocaine with **CLAUDIO,** one (1) controlled purchase of crack cocaine with **FERNANDEZ,** and two (2) controlled purchases of crack cocaine/cocaine with both **CLAUDIO** and **FERNANDEZ.**[3]  The investigation revealed that **CLAUDIO** and **FERNANDEZ** lived together and were boyfriend/girlfriend who worked cooperatively in distributing ounce and multi-ounce quantities of crack cocaine and other drugs.

### A. AUGUST 30, 2017 PURCHASE OF 78.3 GRAMS OF COCAINE BASE FROM CLAUDIO

9.   The first buy that CW-1 made directly from **CLAUDIO** took place on August 30, 2017. The August 30, 2017 buy was initiated when another individual put CW-1 in contact with **CLAUDIO** so that CW-1 could purchase three (3) ounces of crack cocaine. Specifically, CW-1 was told to go to 343 Lowell Street in

---

charges in the hopes that his cooperation would assist in the disposition of the case (which it to date has). CW-1 was also paid approximately $15,000 for services by the FBI exclusive of relocation costs. Apart from the arrest that prompted CW-1's cooperation in the first place, CW-1 has no criminal record but is a user of marijuana. Agents working with CW-1 (including myself) believe that the information CW-1 provided has been accurate and reliable.

3 CW-1 conducted five (5) controlled purchases of crack cocaine with two other individuals who were directly supplied by **CLAUDIO.**

Lawrence to meet **CLAUDIO** and purchase three (3) ounces of crack cocaine for $4500.

10. In anticipation of the buy, agents met with CW-1 to prepare CW-1 for the purchase. CW-1 was searched for cash and contraband (with negative results) and provided with $4500 in buy money, audio and video recording equipment, and sent into the area of 343 Lowell Street where he/she arrived at approximately 4:40 PM.

11. Once at 343 Lowell Street, CW-1 found **CLAUDIO** and a male waiting for him/her. **CLAUDIO** directed CW-1 to get into the passenger seat of her white Honda and she then joined CW-1 by getting into the driver's seat. Once inside, CW-1 gave **CLAUDIO** the cash, telling her, "Here, count it." After **CLAUDIO** had counted the money and determined that it was correct, she handed CW-1 three (3) bags of an off white substance that had been sitting in the compartment on the driver's side door.

12. Once the deal was complete, CW-1 got out of **CLAUDIO**'s Honda, talked briefly to the male who had greeted him/her on arrival, and then returned to a predetermined meeting location where CW-1 met with myself and another agent and handed over the drugs, the recording equipment, was searched for a second time, and then debriefed.

13. Upon return to our offices, the drugs that CW-1 had

purchased from **CLAUDIO** were identified as crack cocaine, weighed
(87.92 grams with the original packaging) field tested (positive
for cocaine) and sent to the DEA Regional Laboratory in New
York. On December 31, 2018, the DEA Lab certified that the drugs
were 78.3 grams of cocaine base.

### B. SEPTEMBER 21, 2017 PURCHASE OF 79.32 GRAMS OF COCAINE BASE FROM CLAUDIO

14.    CW-1 next met with **CLAUDIO** to purchase three (3) more
ounces of crack cocaine on September 21, 2017.  This second buy
was initiated earlier in the day of September 21 when CW-1 met
with myself and contacted **CLAUDIO** by phone at 978-885-8996.
Upon ending the call (which like all communications by CW-1 with
**CLAUDIO** were conducted in Spanish),[4] CW-1 confirmed that he/she
had spoken with **CLAUDIO**, who agreed to sell CW-1 three (3)
ounces of crack cocaine.  Based on prior sales, agents were
aware that **CLAUDIO** charged $1500 per ounce for a total of $4500.

15.    In anticipation of the buy, agents took up
surveillance in the area of 92 Haverhill Street in Lawrence
where **CLAUDIO** was believed to be living.  Agents were also aware
from earlier buys that **CLAUDIO** drove a white Honda Accord
bearing MA license plate 3RZ-815 that was registered to **NORMA**

---

[4] During part of the underlying investigation, my co-case agent
was an individual who spoke Spanish.  That agent was transferred
to another jurisdiction during the investigation.

**CLAUDIO.**

16. Shortly after 4:00 PM, myself and another agent directed CW-1 to contact **CLAUDIO** to finalize arrangements for the buy. In the resulting call, **CLAUDIO** agreed to meet CW-1 at the Tripoli Pizza and Bakery located at 106 Common Street in Lawrence.

17. CW-1 was then prepared for the buy. He/she was searched, given $4500 in buy money, audio and video recording equipment and sent into the area of the Tripoli Pizza and Bakery to meet **CLAUDIO.**

18. Agents watched CW-1 arrive at the Tripoli Pizza and Bakery at approximately 4:20 PM to wait for **CLAUDIO**'s arrival. While this was happening, other agents surveilled **CLAUDIO**'s white Honda (with **CLAUDIO** driving) leaving from 92 Haverhill Street, watching her make a stop at an unknown residence for a short period of time and then leaving, and driving a short distance and letting an unknown individual exit the passenger seat with a bag. **CLAUDIO** then proceeded into the Tripoli parking lot at approximately 4:28 PM.

19. Once **CLAUDIO** pulled into the lot, CW-1 came out and got into the Honda's front seat. CW-1 exited the Honda Accord after the vehicle circled the block. CW-1 then returned to a predetermined meeting location where he/she was searched for a

second time, and turned over the drugs purchased from **CLAUDIO** and the recordings. During CW-1's subsequent debrief, he/she stated that, when CW-1 got into **CLAUDIO**'s car, she asked if CW-1 wanted to do the deal in the parking lot and proceeded to exchange CW-1's buy money for three (3) bags of an off white substance that **CLAUDIO** was holding between her legs.[5]

20. The drugs CW-1 purchased from **CLAUDIO** were later inspected (and determined to be crack cocaine), weighed (87.90 grams with the original packaging), field tested (positive for cocaine base) and sent to the DEA Lab in New York. On October 17, 2018, the DEA Lab certified that the drugs were 79.32 grams of cocaine base.

### C. OCTOBER 25, 2017 PURCHASE OF 53.3 GRAMS OF COCAINE BASE FROM FERNANDEZ INSIDE 92 HAVERHILL STREET

21. The next buy made from **CLAUDIO** and/or **FERNANDEZ** took place on October 25, 2017. This buy was initiated when CW-1 made contact with **FERNANDEZ** during the afternoon of October 24 at **FERNANDEZ** and **CLAUDIO**'s apartment (then located on the *second* floor of 92 Haverhill Street in Lawrence). Initially, myself and the other agents conducted surveillance on the location in an attempt to observe **CLAUDIO** leave the residence so CW-1 could

---

5 After the buy was complete, surveillance agents saw **CLAUDIO** return to 92 Haverhill Street and enter that building.

contact **FERNANDEZ**. After **CLAUDIO** was observed leaving the residence, CW-1 was searched and provided with $3000 in buy money and recording equipment by myself and other agents, then sent to contact **FERNANDEZ** at approximately 4:35 PM. **FERNANDEZ** brought CW-1 upstairs where **FERNANDEZ** told CW-1 that he didn't have two (2) ounces of crack cocaine to sell but advised CW-1 to return in 45 minutes.

22. CW-1 then left and returned to a predetermined meeting location where he/she provided myself and other agents with the unused $3000 buy money, the recording equipment, was searched a second time and was debriefed.

23. At approximately 6:10 PM, CW-1 was prepared to go meet with **FERNANDEZ** a second time to purchase two (2) ounces of crack cocaine. CW-1 was searched again and provided the $3000 buy money and the recording equipment. CW-1 was sent to 92 Haverhill Street where he/she arrived at approximately 6:20 PM, went to the second floor apartment and contacted an unidentified male. The unidentified male advised **FERNANDEZ** and **CLAUDIO** had just left; therefore, CW-1 waited outside for them to return. **FERNANDEZ** and **CLAUDIO** arrived back to 92 Haverhill Street but advised CW-1 that they did not have any more crack cocaine to sell but would have it the following day.

24. In anticipation of the buy, myself and other agents

met with CW-1 at approximately 3:30 PM on October 25 to prepare CW-1 for the crack cocaine purchase. CW-1 was searched for money and contraband (with negative results) and provided with $3000 in buy money, audio and video recording equipment, and sent into the area of 92 Haverhill Street to contact **FERNANDEZ** to purchase the two (2) ounces of crack cocaine where he/she arrived at approximately 3:40 PM.

25. As CW-1 approached 92 Haverhill Street, he/she saw **FERNANDEZ** approaching his residence with a bicycle. **FERNANDEZ** invited CW-1 to come to the second floor apartment. Once inside, CW-1 gave **FERNANDEZ** the buy money. **FERNANDEZ** returned $200 of the buy money back due to **FERNANDEZ** charging CW-1 $2800 for the two ounces of crack cocaine. **FERNANDEZ** then went to a nearby kitchen cabinet from which he removed crack cocaine and then prepared two (2) ounces that he weighed, packaged, and provided to CW-1. Once the deal was complete, CW-1 left **FERNANDEZ**'s apartment and returned to a predetermined meeting location where CW-1 met with myself and other agents from my task force and handed over the drugs, the recording equipment, was searched for a second time and then debriefed.

26. Upon return to our offices, the drugs that CW-1 had purchased from **FERNANDEZ** were identified as crack cocaine, weighed (58.75 grams with the original packaging) field tested

(positive for cocaine base) and sent to the DEA Regional Laboratory in New York. On March 15, 2018, the DEA Lab certified that the drugs were 53.3 grams of cocaine base.

### D. ATTEMPTED IDENTIFICATION OF FERNANDEZ ON NOVEMBER 3, 2017

27. On November 3, a physical surveillance was conducted on **CLAUDIO** and **FERNANDEZ** in an attempt to confirm **FERNANDEZ'** identity. At the time, the task force only knew **FERNANDEZ** as "**RAMON.**" Agents saw **CLAUDIO** and **FERNANDEZ** leave 92 Haverhill Street and enter the white Honda Accord bearing MA license plate 3RZ 815 which was registered to **CLAUDIO**. **CLAUDIO** entered the driver seat of the vehicle as **FERNANDEZ** entered the front passenger seat. A vehicle stop was initiated by two MSP troopers. The troopers contacted both **CLAUDIO** and **FERNANDEZ** as well as obtained **CLAUDIO's** driver's license. As soon as **FERNANDEZ'**s name was requested by the trooper, **CLAUDIO** drove off attempting to elude the troopers even though **CLAUDIO's** driver's license was still in the possession of the troopers. The troopers did not pursue the vehicle.

28. **CLAUDIO** was observed running back to 92 Haverhill Street, entering the front door and then exiting the front door with a plastic bag in her possession and going around the building to an unknown location. The Honda Accord was located

unoccupied away from 92 Haverhill Street.

29.     On November 9, 2017, CW-1 spoke with **CLAUDIO** who advised CW-1 that she and **FERNANDEZ** ran from law enforcement when they were pulled over in her white Honda Accord.  **CLAUDIO** advised she waited for the law enforcement officers to exit their vehicle and then took off, went around the corner, and dropped **FERNANDEZ** off who fled on foot.  **CLAUDIO** advised CW-1 that they ran due to them having approximately seven (7) to eight (8) ounces of crack cocaine, a firearm, and approximately $26,000 in the vehicle as well as **FERNANDEZ** not having legal documentation to be in the United States.

30.     **CLAUDIO** advised CW-1 that she planned to move to a different location due to the apartment being too "hot" with law enforcement and with other individuals, who attempted to rob her, knowing where **CLAUDIO** and **FERNANDEZ** lived.  Due to individuals attempting to rob her, **CLAUDIO** and **FERNANDEZ** kept firearms in their residence.  **CLAUDIO** also advised that she and **FERNANDEZ** would keep smaller amounts of crack cocaine in their apartment and keep the larger amounts in an unknown stash location.

31.     On December 13, 2017, CW-1 went to 92 Haverhill Street Apt. 2 to contact **CLAUDIO**.  **CLAUDIO** allowed CW-1 to enter the apartment and CW-1 observed the apartment to be empty

because **CLAUDIO** and **FERNANDEZ** were moving to a different residence. The CW also reported that FERNANDEZ was hiding in the closet with a handgun.

### E. JANUARY 31, 2018 PURCHASE OF 27.0103 GRAMS OF COCAINE BASE FROM CLAUDIO

32.    CW-1 also met with **CLAUDIO** to purchase one (1) ounce of crack cocaine on January 31, 2018.  This buy was initiated earlier in the day of January 31 when CW-1 met with myself and contacted **CLAUDIO** by phone at 978-387-7928.  Upon ending the call (which like all communications with **CLAUDIO** were conducted in Spanish), CW-1 confirmed that he/she had spoken with **CLAUDIO**, who agreed to sell CW-1 one (1) ounce of crack cocaine for $1400.

33.    In anticipation of the buy, myself and another agent met with CW-1 at approximately 1:23 PM and contacted **CLAUDIO** by phone at 978-387-7928. Upon ending the call (which like all communications with **CLAUDIO** were conducted in Spanish), CW-1 confirmed that he/she had spoken with **CLAUDIO**, who agreed to meet CW-1 at the Tripoli Pizza and Bakery located at 106 Common Street to sell CW-1 one (1) ounce of crack cocaine. The CW was searched for cash and contraband (with negative results) and provided with $1400 in buy money, audio and video recording equipment, and sent to the area of 106 Common Street where

he/she arrived at approximately 1:33 PM.

34.     Prior to the controlled purchase, surveillance had been established in the area of 92 Haverhill Street.  Even though **CLAUDIO** and **FERNANDEZ** had stated that they had moved, surveillance located the white Honda Accord bearing license plate 3RZ 815 parked in front of the address.  The vehicle then departed; however, surveillance agents did not follow due to **CLAUDIO** being known to conduct "heat runs" to identify any surveillance.  Also, **CLAUDIO** had previously indicated to CW-1 that she had been followed by law enforcement in the past which caused her to change her telephone number.

35.     As CW-1 waited for **CLAUDIO**, she contacted him/her by phone and advised she had to go to her  new house in South Lawrence to obtain the narcotics and then would be on her way to meet CW-1.  Once **CLAUDIO** pulled into the lot, CW-1 entered the Honda's front seat.  CW-1 exited the Honda Accord after the vehicle circled the block.  CW-1 then returned to a predetermined meeting location where he/she was searched for a second time, and turned over the drugs purchased from **CLAUDIO** and the recordings.

36.     The drugs CW-1 purchased from **CLAUDIO** were later inspected (and determined to be crack cocaine), weighed (29.2 grams with the original packaging), field tested (positive for

cocaine base) and sent to the DEA Lab in New York. On March 15, 2018, the DEA Lab certified that the drugs were 27.0103 grams of cocaine base.

### F. FEBRUARY 14, 2018 PURCHASE OF 27.5513 GRAMS OF COCAINE BASE FROM CLAUDIO AND FERNANDEZ

37.     CW-1 next met with **CLAUDIO** and **FERNANDEZ** to purchase one (1) ounce of crack cocaine on February 14, 2017.   In anticipation of the buy, myself and another agent met with CW-1 at approximately 3:00 PM and contacted **CLAUDIO** by phone at 978-387-7928. Upon ending the call (which like all communications with **CLAUDIO** were conducted in Spanish), CW-1 confirmed that he/she had spoken with **CLAUDIO**, who agreed to meet CW-1 at the Tripoli Pizza and Bakery located at 106 Common Street to sell CW-1 one (1) ounce of crack cocaine for $1400.   CW-1 was searched for cash and contraband (with negative results) and provided with $1400 in buy money, audio and video recording equipment, and sent to the area of 106 Common Street where he/she arrived at approximately 3:20 PM.

38.     Once **CLAUDIO** pulled into the lot in the white Honda Accord, surveillance observed that the vehicle was also occupied by a front passenger who was later identified as **FERNANDEZ**.   CW-1 entered into the Honda's rear passenger seat.   CW-1 exited the Honda Accord after the vehicle drove a short distance.   CW-1

then returned to a predetermined meeting location where he/she was searched for a second time, and turned over the drugs purchased from **CLAUDIO** and **FERNANDEZ** as well as the recording equipment. During CW-1's subsequent debrief, CW-1 advised he/she handed **CLAUDIO** the money after entering the vehicle in which **CLAUDIO** retrieved the crack cocaine from the driver's door side door handle and passed it back to CW-1. Before exiting the Honda, CW-1 observed approximately six (6) to seven (7) individually packaged ounces of crack cocaine sitting between **CLAUDIO**'s legs.

39.     The drugs CW-1 purchased from **CLAUDIO** and **FERNANDEZ** were later inspected (and determined to be crack cocaine), weighed (29.28 grams with the original packaging), field tested (positive for cocaine base) and sent to the DEA Lab in New York. On March 15, 2018, the DEA Lab certified that the drugs were 27.5513 grams of cocaine base.

40.     Surveillance was conducted on **CLAUDIO** and **FERNANDEZ** with assistance of the FBI Air Section at the conclusion of the February 14 controlled purchase of the crack cocaine. The Air Section was utilized due to **CLAUDIO**'s counter surveillance techniques. During the surveillance operation, **CLAUDIO** was positively identified as the driver and **FERNANDEZ** as the front passenger. They exhibited actions consistent with that of

conducting drug transactions by meeting with individuals at different locations for short amounts of time. However, the drug transactions could not be confirmed.

## G. OCTOBER 5, 2018 PURCHASE OF 27.8 GRAMS OF COCAINE FROM CLAUDIO AND FERNANDEZ

41.    CW-1 met with **CLAUDIO** and **FERNANDEZ** to purchase one (1) ounce of cocaine on October 5, 2018. In anticipation of the buy, myself and another member of the task force met with CW-1 at approximately 9:40 AM on October 5 and CW-1 was searched for cash and contraband (with negative results). CW-1 contacted **CLAUDIO** by phone at 978-609-6008. Upon ending the call (which like all communications with **CLAUDIO** were conducted in Spanish), CW-1 confirmed that he/she had spoken with **CLAUDIO**, who agreed to sell CW-1 one (1) ounce of cocaine for $1350 in the area of the Market Basket Grocery Store located at 700 Essex Street, Lawrence, MA.

42.    CW-1 re-contacted **CLAUDIO** by phone at 978-609-6008. Upon ending the call (which like all communications with **CLAUDIO** were conducted in Spanish), CW-1 confirmed that he/she had spoken with **CLAUDIO** who advised she misunderstood CW-1 on the first call and thought CW-1 wanted to purchase one (1) of powder cocaine instead of crack cocaine from **CLAUDIO** for the price of $1350. **CLAUDIO** increased the price of one (1) ounce of crack

cocaine to $1500. CW-1 re-contacted **CLAUDIO** by phone at 978-609-6008. Upon ending the call (which like all communications with **CLAUDIO** were conducted in Spanish), CW-1 confirmed that he/she had spoken with **CLAUDIO**. At the direction of myself, CW-1 informed **CLAUDIO** that he/she would purchase the one (1) ounce of powder cocaine for $1350 instead of the crack cocaine for $1500. These instructions were based on the fact that CW-1, the other task force member and I were already in the area of the Market Basket and I had only brought $1350 for the controlled purchase.

43. CW-1 was provided with $1350 in buy money, audio and video recording equipment, and sent to the area of 700 Essex Street where he/she arrived at approximately 10:26 AM.

44. Initially **CLAUDIO** brought crack cocaine instead of the powder cocaine, therefore, she had to go back to her residence at the time, believed to be in South Lawrence, to obtain the powder cocaine to complete the drug transaction with CW-1. **CLAUDIO** arrived at the Market Basket along with **FERNANDEZ** who was the front passenger in a 2007 silver Honda Accord bearing license plate 3RZ 815 which was registered to **CLAUDIO** at 92 Haverhill Street Apt. 2. CW-1 entered the rear passenger seat and exited after approximately one (1) minute. CW-1 then returned to a predetermined meeting location where he/she was

searched for a second time, and turned over the drugs purchased from **CLAUDIO** and **FERNANDEZ** as well as the recording equipment. During CW-1's subsequent debrief, CW-1 advised he/she entered the silver Honda Accord with **CLAUDIO** and **FERNANDEZ**. **FERNANDEZ** handed CW-1 the powder cocaine and he/she exited the vehicle. CW-1 had already given **CLAUDIO** the money when they initially met, when she realized she had brought crack cocaine instead of powder cocaine.

45.  The drugs CW-1 purchased from **CLAUDIO** and **FERNANDEZ** were later inspected (and determined to be cocaine), weighed (29.32 grams with the original packaging), field tested (positive for cocaine) and sent to the DEA Lab in New York. On April 18, 2019, the DEA Lab certified that the drugs were 27.8 grams of cocaine.

### H.  IDENTIFICATION OF NEW VEHICLE REGISTERED TO CLAUDIO AT THE TARGET PREMISES ON FEBRUARY 1, 2019

46.  On February 1, 2019, a member of the task force observed a 2005 black Grand Jeep Cherokee bearing MA license plate 3RZ 815 registered to **CLAUDIO** at 92 Haverhill Street Apt. 2. The vehicle was parked at 92 Haverhill Street. The license plate was reassigned to this vehicle on January 28, 2019.

### I.  JULY 29, 2019 SURVEILLANCE OF CLAUDIO AND FERNANDEZ AND THE IDENTIFICATION OF THE TARGET VEHICLE

II.

47.  The investigation had determined that **CLAUDIO** and

**FERNANDEZ** had moved back to 92 Haverhill Street and were now utilizing the Target Vehicle a white 2007 Infiniti G35 sedan bearing the same MA license plate (3RZ 815) and registered to **CLAUDIO** at 92 Haverhill Street Apt. 1. The Target Vehicle had been assigned the license plate on July 9, 2019. On July 29, 2019 at approximately 6:00 pm, the FBI Air Section, other members of the task force, and I conducted surveillance on both **CLAUDIO** and **FERNANDEZ**.

48. The surveillance operation observed both **CLAUDIO** and **FERNANDEZ** leave 92 Haverhill Street and enter the Target Vehicle after **FERNANDEZ** exited the front door of the building. **CLAUDIO** entered the driver's seat of the Target Vehicle as **FERNANDEZ** entered the front passenger seat. They drove to Maple Street at Lawrence Street where they stopped in the middle of the street and allowed an unknown individual to enter the back passenger seat. The Target Vehicle drove a short distance and then the unknown individual exited the vehicle after approximately twenty (20) seconds. **CLAUDIO** and **FERNANDEZ** then drove back to 92 Haverhill Street. These actions were consistent with that of someone completing a drug transaction; however, the surveillance team could not locate the unknown individual who entered the vehicle and could not confirm the drug transaction.

49. Once at the residence, **CLAUDIO** remained outside and

contacted an unknown individual as **FERNANDEZ** entered the front
door of 92 Haverhill Street. After approximately one (1)
minute, **FERNANDEZ** exited the front door and they departed the
residence. Once again, **CLAUDIO** entered the driver's seat of the
Target Vehicle as **FERNANDEZ** entered the front passenger seat.

50. **CLAUDIO** and **FERNANDEZ** drove directly to Springfield
Street at Parker Street and pulled to the right of the street
and park. However, the Target Vehicle was still in the street
and not in a proper parking spot against the sidewalk. A
Hispanic male wearing blue clothing who was later identified and
will be referred to here only as "E.C.,"[6] approached and entered
the back passenger seat. After approximately seventeen (17)
seconds, E.C. exited the Target Vehicle and it drove away from
the area. Believing that these actions were consistent with
someone who just completed a drug transaction, myself and other
members of the task force approached E.C. who was walking down

---

6 E.C. agreed to speak with the arresting officers but has not
been signed up as a source or provided any information other
than in his post-Miranda statement. E.C.'s criminal history
involves arrests for drug violations and resisting arrest in New
Hampshire where he was convicted on 3/29/2018 for Control Drug:
Control Premises where Drugs. In Massachusetts, he has been
arrested for drug violations, breaking and entering,
trespassing, kidnapping, armed robbery, assault and battery with
danger weapon, and fail to stop for police. The adult charges
in Massachusetts have been dismissed except for the arrest on
July 29, 2019 for the drug/firearm violations.

the sidewalk. We exited our vehicles and identified ourselves as law enforcement officers. Upon seeing us, E.C. began to run but was quickly apprehended. As E.C. was being arrested and actively trying to get away, he threw several objects one of which appeared to be a white object. In the area the objects were thrown, a plastic bag containing approximately twenty eight (28) grams of an off-white rock like substance consistent with that of crack cocaine was located along with a small silver loaded .22 caliber revolver. E.C. also had in his possession approximately sixteen (16) grams of an off-white rock like substance consistent with that of crack cocaine and $2403.00 in his pocket.

51. While in the booking area of the Lawrence Police Department, E.C. was given his Miranda rights and agreed to answer questions after signing the Miranda Warning form and advising he understood his rights. E.C. stated he had approximately one (1) ounce of crack cocaine in one (1) bag and another five (5) grams of crack cocaine in the other bag. He stated that he receives approximately one (1) ounce of crack cocaine every two (2) days at the price of $1300 per ounce from his crack cocaine supplier he identified as "**NORMA**".

52. "**NORMA**" called E.C. to obtain $1900 that he owed her for previous narcotics he had received from her. E.C. told

"**NORMA**" to come get the money and to bring him "something" as well. He identified "**NORMA**'s" telephone number as 978-902-7484 and had her saved in his contacts as "Nolma2". When the white four-door sedan arrived, he entered the rear of the vehicle and gave the $1900 to "**NORMA**" that he owed and received an additional ounce of crack cocaine from the older male in the front passenger seat. E.C. would have to pay for that ounce of crack cocaine in two (2) days when he gets resupplied by "**NORMA**". E.C. also identified **CLAUDIO**'s previous vehicle as a black Jeep prior to the white four door sedan which we identified as the Target Vehicle.

53. On July 30, 2019 National Grid Electric Company confirmed that an individual identified as "**NORMA** Clauvio" with the same last four (4) of **CLAUDIO**'s social security number as having active utilities at "92 HAVERHILL ST 1FRT LAWRENCE MA 01840". This is believed to be the Target Premises.

54. CW-1 advised the front door of 92 Haverhill Street only allows access to the first floor front apartment and the second floor front apartment. The video taken on October 25, 2017 shows the entrance to the Target Premises is a white door on the immediate right upon entering the front entrance to the building.

## CRIMINAL HISTORY OF DRUG CONVICTIONS FOR CLAUDIO AND FERNANDEZ

55.    A review of **CLAUDIO's** Massachusetts Board of Probation Records reveals that **CLAUDIO** was convicted in Lawrence District Court of Distribute/Dispense Class B Cocaine and Distribute of Cocaine in a School zone on June 5, 2006 where she received two years of imprisonment.  On that same date, she was convicted of two additional counts of Distributing Cocaine, also in Lawrence District Court.

56.    A review of **FERNANDEZ'** Massachusetts Board of Probation Records reveals that he was convicted of the following drug crimes on December 13, 2004 in Essex County Superior Court: Trafficking Controlled Substance (8 years – 8 years and 1 day of imprisonment), Distribute/Dispense Class B (5 years – 5 years 1 day of imprisonment), Two (2) counts Controlled Substance School (2.5 – 2.5 years 1 day of imprisonment), and Trafficking Controlled Substance Cocaine (3 years – 3 years 1 day of imprisonment).  **FERNANDEZ** was also convicted of Possession to Distribute Class B (1 year of imprisonment) and Possession to Distribute Class A (1 year of imprisonment) on January 22, 2004.

## DRUG TRAFFICKERS' USE OF RESIDENCES AND VEHICLES GENERALLY

57.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice

for individuals who distribute controlled substances to maintain in their residences drugs, drug paraphernalia and records relating to their drug trafficking activities and to transport, and/or store drugs and drug paraphernalia in their vehicles for easy access.

58.  Because individuals who distribute controlled substances in many instances will "front" (that is, sell on consignment) drugs to their clients, or alternatively, will be fronted drugs from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  Often individuals who distribute controlled substances keep pay and owe records to show balances due for drugs sold in the past and for payments expected by the trafficker's suppliers and the trafficker's dealers. Additionally, individuals who distribute controlled substances must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

59.  Based upon my training and experience, I am also aware that it is generally a common practice for distributors of controlled substances to conceal at their residences sums of money, either the proceeds from drug sales or monies to be used

to purchase controlled substances.  Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug distribution would also typically be maintained in residences.

60.  I also know based upon my training and experience that powder drugs such as cocaine, fentanyl and heroin are cultivated or manufactured in source countries' outside the United States, and then brought into the United States through various ports of entry.  Consequently, traffickers in powder drugs often travel (or pay and arrange for others to travel on their behalf) to acquire cocaine, or make arrangements to have the cocaine shipped to them.  Such travel and/or shipping necessarily results in the generation of various documents, which typically are also kept in the trafficker's residence.

61.  I have participated in the execution of numerous search warrants at the residences of individuals who distribute controlled substances.  In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, drug-related evidence have typically been recovered, including controlled substances, controlled substances paraphernalia, and documents related to controlled substances distribution, such as books, records, receipts, notes, ledgers, and other papers relating to the purchase and/or

distribution of controlled substances; cash, currency, and records relating to controlled substances, income and expenditures of money and wealth; and firearms and ammunition.

62.   In addition, during the course of such residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject Premises.   Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

63.   My awareness of these drug distribution practices, as well as my knowledge of the drug use and distribution techniques as set forth in this Affidavit, arise from the following:

a)   My own involvement in prior drug investigations and searches during my career as a law enforcement officer, as previously described;

b)   my involvement on a number of occasions in debriefing confidential informants and cooperating individuals in prior drug investigations, as well as what other law enforcement agents and officers have advised me when relating the substance of their similar debriefings

and the results of their own drug investigations; and

c)   other information provided through law enforcement
     channels.

## ITEMS TO BE SEIZED

64.  Based upon all of the information I have obtained
during the course of this investigation, and for the reasons
more specifically set forth above, I submit that there is
probable cause to believe that evidence regarding illegal drug
activities will be found in the Target Premises and Target
Vehicle.   More specifically, I submit that there is probable
cause to believe that the following items of evidence will be
found in the subject Premises:

1.   controlled substances, including crack cocaine and
     cocaine;

2.   paraphernalia for the packaging, processing and
     distribution of controlled substances such as crack
     cocaine and cocaine, to include plastic bags and
     seals, scales, "cutting" agents used to dilute/extend
     cocaine and to cook crack cocaine prior to sale;nes;

3.   Books, records, notes, ledgers, and any
     other papers or records relating to the
     purchase, transportation, shipment,
     ordering, sale, importation, manufacture,
     and/or distribution of controlled substances
     and/or records relating to the receipt,
     disposition, and/or laundering of proceeds
     from the distribution of controlled
     substances, such as crack cocaine and
     cocaine, and/or records or electronic
     devices reflecting the identity of co-
     conspirators and drug customers, as well as

their addresses, telephone, and pager numbers. Such documents include, but are not limited to, telephone address books, planners, receipts, state and federal income tax returns and supporting paperwork, notes, ledgers, bank records, money orders, wire transfers, cashier's checks, passbooks, certificates of deposit, bills, vehicle rental receipts, credit card receipts, hotel receipts, meal receipts, travel agency vouchers, travel schedules, shipment records, telephone bills and/or toll records and bills and cellular telephones;

4.   Cash and currency, and other items of value made or derived from trafficking in illegal substances or documents related thereto. Such items include, but are not limited to jewelry, precious metals, titles, deeds, monetary notes, registrations, purchase or sale invoices, bank records, or any other papers concerning financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in illegal substances.

5.   Documents reflecting dominion and/or control of 92 Haverhill Street, First Floor Front Apartment, Lawrence, Massachusetts, including, but not limited to, canceled mail, photographs, personal telephone books, diaries, bills and statements, keys, identification cards and documents, bank books, checks, and check registers.

6.   Documents reflecting dominion and/or control of 92 Haverhill Street, Second Floor Front Apartment, Lawrence, Massachusetts, including, but not limited to, canceled mail, photographs, personal telephone books, diaries, bills and statements, keys, identification cards and bank books, checks, and check registers.

7. Documents or tangible evidence reflecting
dominion, ownership, and/or control by **NORMA
CLAUDIO** and **JUAN RAMON FERNANDEZ** over any
bank accounts, safe deposit boxes, stocks,
bonds, mutual funds, and any other financial
and/or monetary assets, instruments or
interests, and over any tangible assets such
as motor vehicles, real property, and
commercial storage facilities.

8. Photographs of individuals, property, and/or
illegal controlled substances.

9. Firearms, including ammunition, magazines, holsters,
and any components of firearms.

## CONCLUSION

65. Based upon the foregoing, and based upon my training
and experience, I submit that there is probable cause to believe
that the Target Premises and the Target Vehicle, which are more
specifically described above, presently contain the items set
forth above, and that those items constitute evidence of the
commission of a criminal offense, contraband, the fruits of
crime, things otherwise criminally possessed, and property
designed or intended for use or which is or has been used as the
means of committing a criminal offense, specifically, violations
of 21 U.S.C. §§841(a)(1) and 846. Accordingly, I respectfully
request that search warrants be issued for the seizure of these

items in the Target Premises and Target Vehicle described above.

_____
CHARLES E. SIMON
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION


Subscribed and sworn to
before me, this 16th day
of August, 2019.

_____
HON. MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

## **ATTACHMENT A**

The Target Premises is described as follow:

> The Target Premises encompasses 92 Haverhill Street, First Floor Front Apartment, Lawrence, MA. 92 Haverhill Street is a multifamily two-story red brick home. There are 2 entry doors to the first floor front apartment, one at the front of the building and the other at the right side of the building. 92 is marked on the right front pillar of the building by the front door in black numbers. The front door to the First Floor Front Apartment is immediately to the right upon entering the front door to the building. The door is white and has a double locking system. Photos of the Target Premises are attached.







## **ATTACHMENT B**

1. controlled substances, including crack cocaine and cocaine;

2. paraphernalia for the packaging, processing and distribution of controlled substances such as crack cocaine and cocaine, to include plastic bags and seals, scales, "cutting" agents used to dilute/extend cocaine and to cook crack cocaine prior to sale;

3. Books, records, notes, ledgers, and any other papers or records relating to the purchase, transportation, shipment, ordering, sale, importation, manufacture, and/or distribution of controlled substances and/or records relating to the receipt, disposition, and/or laundering of proceeds from the distribution of controlled substances, such as crack cocaine and cocaine, and/or records or electronic devices reflecting the identity of co-conspirators and drug customers, as well as their addresses, telephone, and pager numbers. Such documents include, but are not limited to, telephone address books, planners, receipts, state and federal income tax returns and supporting paperwork, notes, ledgers, bank records, money orders, wire transfers, cashier's checks, passbooks, bills, vehicle rental receipts, credit card receipts, hotel receipts, meal receipts, telephone bills and/or toll records and bills and cellular telephones.

4. Cash and currency, and other items of value made or derived from trafficking in illegal substances or documents related thereto. Such items include, but are not limited to jewelry, precious metals, titles, deeds, monetary notes, registrations, purchase or sale invoices, bank records, or any other papers concerning financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in illegal substances.

5. Documents reflecting dominion and/or control of 92 Haverhill Street, First Floor Front Apartment, Lawrence, Massachusetts, including, but not limited to, canceled mail, photographs, personal telephone books, diaries, bills and statements, keys, identification cards and documents, bank books, checks, and check registers.

6. Documents reflecting dominion and/or control of 92 Haverhill Street, Second Floor Front Apartment, Lawrence, Massachusetts, including, but not limited to, canceled mail, photographs, personal telephone books, diaries, bills and statements, videotapes, keys, identification cards and documents, bank books, checks, and check registers.

7. Documents or tangible evidence reflecting dominion, ownership, and/or control by **NORMA CLAUDIO** and **JUAN RAMON FERNANDEZ** over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

8. Photographs of individuals, property, and/or illegal controlled substances.

9. Firearms, including ammunition, magazines, holsters, and any components of firearms.